### In re 4500 NORTH HERMITAGE AVE. APARTMENTS CORPORATION.

### CLOVERDALE STATE BANK et al. v. SCHWEERS et al.

### No. 7406.

Circuit Court of Appeals, Seventh Circuit. March 20, 1941.

858

■■■■■■■■■■■■■■■■■■■■■■■

Arthur Abraham, of Chicago, Ill., for appellants.

Irving S. Abrams, of Chicago, Ill., for appellees.

Before SPARKS and KERNER, Circuit Judges, and BALTZELL, District Judge.

BALTZELL, District Judge.

On February 25, 1937, an involuntary petition under Section 77B of the then existing Bankruptcy Act, 11 U.S.C.A. § 207, was filed in the district court by three creditors of the 4500 North Hermitage Avenue Apartments Corporation, a corporation (hereinafter referred to as the debtor), one of which creditors was appellant, Cloverdale State Bank. The amount of the claim of such bank, as shown by the petition, was $19,500. It was the intent and purpose of the creditors filing the petition to perfect a reorganization of the debtor pursuant to the provisions of Section 77B of the Bankruptcy Act. The business of the debtor was owning, leasing and operating an apartment building located at 4500 North Hermitage Avenue, in the city of Chicago, Illinois.

On May 7, 1937, the district court approved the petition as having been filed in good faith and, on May 18, following, the Consolidated Bondholders Committee which had theretofore been granted leave so to do, filed a proposed plan of re-organization. Certain amendments to the plan, as originally filed, were made, and, on May 6, 1938, the plan, as amended, was confirmed by the court. By the terms of such amended plan, a new corporation to be known as the Hermitage Avenue View Apartments, Inc. (hereinafter referred to as the new corporation), was to be organized and the property transferred to it. The outstanding bonds of the debtor, some of which were of the Belvidere issue, and some of which were of the Hermitage issue, were to be exchanged for stock in the new corporation, all of which stock was to be held by three voting trustees to be selected and approved by the district court under a five-year voting trust agreement. The bonds were then to be cancelled and certificates of beneficial interest were to be issued by the voting trustees to all holders of bonds thus surrendered and cancelled in the ratio of one unit of beneficial interest, evidencing the holding by the voting trustees of

one share of the common capital stock in the new corporation for each $100 par value of bonds theretofore held by the bondholders. This provision applied to holders of bonds of the Belvidere issue who had not exchanged such bonds for bonds in the Hermitage issue, as well as bonds in the Hermitage issue. The property of the debtor was transferred to the new corporation, and Malcolm Schweers, Louis E. Nelson and Saul R. Optner, appellees, were named voting trustees under the terms of the amended plan, qualified as such, and are now acting in that capacity.

On May 25, 1939, the appellants, The Bond & Mortgage Liquidation Corporation, and the Cloverdale State Bank, respectively, filed a petition in the bankruptcy proceeding in the district court, in which petition it is alleged that the former is entitled to certificates of beneficial interest representing 127.2 shares of the common capital stock of the new corporation, and that the latter is entitled to certificates of beneficial interest in such corporation representing 185 shares of such common capital stock. It is further alleged that no provision was made in the decree of confirmation of the plan for the exchange of outstanding bonds and capital stock of the debtor for the certificates of beneficial interest, and that such exchange should be made. The voting trustees and the new corporation filed objections to such petition, and, among other things, prayed "that the claim of the Cloverdale State Bank be vacated, set aside and declared for naught." Such petition and objections, together with the answer of the bank to such objections, were referred to the Special Master, who had theretofore been appointed under a general reference, for hearing and report. The Master filed his report on November 13, 1939, in which report, among other things, he found "from all the evidence, the Cloverdale State Bank is the owner of the bonds of the Belvidere issues Nos. 91, 92 and 93, aggregating a principal of $1,500.00, and of bonds 29 and 34 of the Hermitage issue in the aggregate principal of $1,000.00, and of bonds 100 to 128 of the Hermitage issue in the principal amount of $14,500.00, * * * and that said bonds are not subject to any defenses in the hands of the Cloverdale State Bank." In effect, the report recommended the allowance of the claim of appellant, Cloverdale State Bank, in the sum of $17,000, to which report the voting trustees and the new cor-

poration filed objections. The Consolidated Bondholders Committee also filed separate objections. On December 29, 1939, the district court overruled the objections, approved the report and ordered that the claim of the bank be allowed in full, as recommended by the Master, and that certificates of beneficial interest be issued by the voting trustees to the bank in exchange for bonds aggregating the principal sum of $17,000. On January 12, 1940, the voting trustees, as such and as officers and directors of the new corporation, filed a petition in the district court in which it sought to have the court vacate and set aside the order in which it had approved the report of the Master and allowed the claim of the bank, and to grant a rehearing, which petition was granted, such order vacated and set aside, and a rehearing was had before the court. As a result of such rehearing, the court entered a decree allowing the claim of appellant, bank, in the sum of $2,500, and disallowing its claim in the sum of $14,500, being the amount represented by bonds numbered 100 to 128, both inclusive, of the Hermitage issue, from which decree disallowing such claim this appeal is being prosecuted. The sole question presented is whether or not the district court properly denied such claim.

On February 10, 1926, Charles H. Shaefer and Anna D. Shaefer, his wife, and Fontella C. Jewett and Eugene F. Jewett, her husband, executed principal bonds in the aggregate amount of $90,000, being numbered 1 to 220, both inclusive. To secure the payment of such bonds they executed a trust deed to Russell Firebaugh, as trustee, conveying the real estate and improvements located at 4500 North Hermitage Avenue, Chicago, Illinois, being the same real estate and apartment building which was afterwards owned by the debtor and which is now owned by the new corporation. The apartment building was then known as the Belvidere Apartments, and the bond issue was known as the Belvidere issue. The bonds were bearer bonds and were sold to the general investing public by The Bond & Mortgage Company, a corporation, of which Russell Firebaugh was president at the time of the sale of such bonds.

Afterwards, default was made in the payment of such bonds and the interest thereon. Under the terms of the trust deed, the trustee, Russell Firebaugh, on September 5, 1929, instituted foreclosure proceedings in the Superior Court of Cook County, Illinois, and a decree of foreclosure and sale was entered in such proceedings on January 20, 1930. Pursuant to the provisions of such decree a sale of the premises was had on February 12, following, at which sale Russell Firebaugh, as trustee, bid in such property for the benefit of the bondholders, as he had a right to do under the terms of the trust deed. No cash was paid by him nor were any bonds deposited by him with the Master at the time of the sale or at any other time. He simply applied the bid made by him as against the amount due to all of the bondholders, as shown by the decree. This sale was afterwards approved by the Superior Court. The Master making the sale issued a certificate of sale to Russell Firebaugh, as trustee, under date of February 13, 1930. Before the period of redemption had expired, Firebaugh, as trustee, assigned such certificate to Paul F. Rogge without any consideration and without the knowledge or consent of the bondholders, or any of them, for whom he was holding such property as trustee. No authority for this transfer can be found in the trust deed and it is entirely beyond the powers created by that instrument. Shortly after the assignment, Rogge and his wife proceeded to execute bonds numbered 1 to 231, both inclusive, in the principal amount of $98,000. To secure the payment of such bonds they executed a trust deed on May 9, 1931 to Russell Firebaugh, as trustee, conveying the real estate and improvements described in such certificate of sale, notwithstanding the facts that the period of redemption had not yet expired and that Rogge held no deed for such property, the Master's deed not having been delivered to him until February 17, 1932. These bonds, both principal and interest, were to be paid at the office of The Bond & Mortgage Company, of which company Russell Firebaugh was at that time president. There was also a provision in the deed that, "In the event of the resignation, refusal, disqualification or other inability or incapacity of the trustee to act as such trustee when and while services shall be required of him under any of the provisions hereof, then the then president of the Bond & Mortgage Company or the president of any successor to said Bond & Mortgage Company shall be and is hereby appointed successor in trust to said trustee * * *." At the time of this bond issue (referred to herein as the Hermitage issue, the name of the apartments having been changed from the

Belvidere to the Hermitage), there was due under the former bond issue (referred to herein as the Belvidere issue) the principal amount of only $79,500, or $18,500 less than the principal amount of the Hermitage issue.

Of the Belvidere issue, there were exchanged for bonds of the Hermitage issue, the principal amount of $56,000, leaving bonds of the Belvidere issue outstanding of the principal amount of $23,500. Bonds of the Hermitage issue in that amount, that is, in the principal amount of $23,500, which were not exchanged for bonds of the Belvidere issue, were delivered up and cancelled in the reorganization proceedings in accordance with the terms of the plan of reorganization, as confirmed by the court, and the certificates of beneficial interest were to be issued by the voting trustees of the new corporation to the holders of bonds (not exchanged) in that amount of the Belvidere issue. It will be seen, therefore, that of the Hermitage issue, there has been accounted for the principal amount of $79,500 of such bonds, that is, $56,000 exchanged, and $23,500 cancelled. Deducting this amount from the entire issue (Hermitage), that is, from $98,000, leaves a difference of $18,500, which represents the amount of the excess of the Hermitage issue over the principal amount due under the Belvidere issue. The bonds representing this amount were retained by The Bond & Mortgage Company, the president of which, as heretofore stated, was Russell Firebaugh, who was also trustee named in the trust deed, for which bonds it advanced no money and paid no consideration. Among the bonds thus retained by it were bonds numbered 100 to 128, both inclusive, in the principal amount of $14,500, which afterwards came into the possession of appellant, Cloverdale State Bank, and which constitute the claim of the bank which was denied by the district court.

On January 4, 1932, The Bond & Mortgage Company executed its promissory note in the principal sum of $50,000, payable to Estelle R. Firebaugh, mother of Russell Firebaugh, and, on December 23 of the same year it executed another promissory note in the principal sum of $24,626.29, payable to her. The consideration for these notes, as shown by the testimony of Russell Firebaugh, was certain advances which she had made to the company from time to time prior to their execution. To secure the payment of the $50,000 note and as collateral thereto there was pledged by the company the aforesaid bonds numbered 100 to 128, both inclusive. To secure the payment of the $24,626.29 note and as collateral thereto, there was pledged by the company the entire capital stock of the appellant, Cloverdale State Bank, all of which was owned by The Bond & Mortgage Company. Upon default in payment of these two notes, Estelle R. Firebaugh, through her son, Russell Firebaugh, as her agent, offered for sale the collateral pledged in accordance with the terms of the pledge agreement, and she purchased the same through her said agent at such sale, her bid being the sum of $2,500 for all collateral, both the bonds and the bank stock. She later transferred the bonds in question, through her said agent, to appellant, Cloverdale State Bank, which transfer was made without any consideration. The fact is, that the bank, whose president, at one time, was Russell Firebaugh, had not been actively engaged in the banking business or any other business since July, 1926, when its assets were ordered restored to it by the Circuit Court of Sangamon County, such assets having been theretofore taken over by the State Auditor of Public Accounts. A receiver was appointed for The Bond & Mortgage Company on January 14, 1933, and all of its assets were purchased by appellant The Bond & Mortgage Liquidation Corporation.

The district court concluded that Estelle R. Firebaugh was not an innocent holder for value without notice, and that appellant, Cloverdale State Bank, took bonds numbered 100 to 128, both inclusive, subject to all defenses. With these conclusions we are in accord, there being substantial evidence to sustain them.

It is appellants' contention that The Bond & Mortgage Company expended a considerable sum of money in the operation of the Hermitage property and for legal expenses, maintenance, interest, etc., for which it was not reimbursed, and that the amount of money thus expended, over and above any reimbursements, is sufficient to constitute a valuable consideration for such bonds which were in the possession of such company at all times after their issue until pledged with Estelle R. Firebaugh. In answer to this contention the evidence fully supports the contention of appellees that The Bond & Mortgage Company was operated by Russell Firebaugh, its president, and that all acts were done by and through him;

that the company collected the rents from such property for some time both prior to and after the appointment of a receiver by the Superior Court in the foreclosure proceedings; that it had been reimbursed for all expenditures; that it was, in fact, indebted to the bondholders of the Belvidere issue, and that, therefore, it paid no consideration for the bonds in question.

It seems that Russell Firebaugh was the person who planned and executed all of the various transactions which finally resulted in appellant, Cloverdale State Bank, acquiring possession of these bonds. The ramifications are so extensive that they are really difficult to comprehend; however, it is apparent that each move was preconceived by him with the ultimate purpose in mind of profiting by such transaction without regard to the interest of the owners of the property or of the bondholders. It was he who was named trustee in the Belvidere bond issue; it was he, through the company of which he was president, who sold these bonds to the investing public and collected the rent from the apartments for a considerable length of time; it was he, as trustee, who instituted the foreclosure proceedings in the Superior Court and obtained a decree of foreclosure and sale upon default in the payment of such bonds; it was he, as trustee, who purchased the property at the foreclosure sale for the benefit of the bondholders; it was he, as trustee, who received from the Master a certificate of sale for such property and within a short time thereafter transferred this certificate to Rogge without any authority so to do, without consideration, in violation of his trust and within the period of redemption; it was he who was named trustee for the bondholders in the trust deed executed by Rogge in the Hermitage bond issue of $98,000, or $18,500 more than was necessary to retire the Belvidere issue; it was The Bond & Mortgage Company, of which he was president and had control, that retained possession of the excess bonds which included the bonds in question until they were pledged as collateral with his mother to secure the payment of a pre-existing debt evidenced by a promissory note of that company under date of January 4, 1932, but for which bonds no consideration was paid by either himself or the company of which he was president; it was he, together with the secretary of the company, Ida Wagner, who had authority to visit the safety deposit box

of his mother, and who, in fact, did visit the box, depositing therein and withdrawing therefrom certain securities as her agent; it was he, acting as agent for his mother, who offered the bonds in question and the stock of appellant, Cloverdale State Bank, for sale, pursuant to the terms of the pledge agreement; it was he, acting as agent for his mother, who purchased such bonds and stock for her, after having given certain parties notice of such sale and signing the name of his mother thereto as "her duly authorized agent"; it was he who, acting as agent for his mother, transferred such bonds to appellant, Cloverdale State Bank, without consideration, the entire capital stock of which bank was then owned by his mother, etc. Estelle R. Firebaugh did not personally participate in any of these transactions; and neither did she appear in court or before the Master in any of the hearings, she being represented at all times by either her son, Russell, or by Ida Wagner, each of whom was her agent, each of whom had actual knowledge of all transactions pertaining to the bonds in question, and each of whom knew of all defects in the title of The Bond & Mortgage Company thereto. Ida Wagner is the Secretary and Treasurer of The Bond & Mortgage Liquidation Corporation, the corporation which purchased all of the assets of The Bond & Mortgage Company, and she was secretary of that company before the sale of its assets. Furthermore, Estelle R. Firebaugh was the owner of a portion of the capital stock of The Bond & Mortgage Company during all of these transactions.

It is apparent that Russell Firebaugh, personally and as president of the Bond & Mortgage Company, had actual knowledge of the fact that no consideration was paid by such company for the bonds in question at the time they were taken into its possession, or at any other time, and that such company was not the owner of such bonds in due course. It is also apparent that, as agent of his mother, Estelle R. Firebaugh, he knew at the time such bonds were pledged to her as collateral to secure the payment of the $50,000 note of The Bond & Mortgage Company that such company had such bonds in its possession only, and was not the owner thereof for a valuable consideration, but that no consideration whatever was paid for them by the company. With this knowledge upon his part, as agent for his mother, he accepted such bonds for her and deposited or had

them deposited for her in her safety deposit box. It is further apparent that Ida Wagner, who was an officer in The Bond & Mortgage Company, and is the present Secretary and Treasurer of The Bond & Mortgage Liquidation Corporation, also acted as an agent for Estelle R. Firebaugh in the handling of these bonds and other of her securities which were deposited in her safety deposit box and withdrawn therefrom by her as such agent. Notice to the agents of Estelle R. Firebaugh was also notice to her. It necessarily follows that she had notice of the defects in the title to the bonds in question, that is, that The Bond & Mortgage Company had paid no consideration for such bonds, was not the owner thereof, but simply had possession of them. She was not, therefore, an innocent holder of such bonds in due course without notice. See Wollenberger et al. v. Hoover et al., 346 Ill. 511, 179 N.E. 42; Bouton et al. v. Cameron et al., 205 Ill. 50, 68 N.E. 800; Fischer v. Tuohy, 186 Ill. 143, 57 N.E. 801; Reilly Tar & Chemical Corporation v. Lewis, 301 Ill.App. 459, 23 N.E.2d 243; Greer et al. v. Carter Oil Co., et al., 373 Ill. 168, 25 N.E.2d 805.

The bonds in question were acquired by the appellant, Cloverdale State Bank, a banking institution which had not functioned as such for many years, with notice or knowledge upon its part of all defects and without consideration. It is, therefore, not a holder in due course. First State Bank & Trust Co. v. First National Bank of Canton, 314 Ill. 269, 145 N.E. 382; In re Continental Engine Co. (Baird v. Smith), 7 Cir., 234 F. 58. Furthermore, all the capital stock of the bank was owned by Estelle R. Firebaugh, the person from whom the bank acquired such bonds. She had notice and knowledge of the defects in the title to such bonds at all times under consideration; therefore, such notice and knowledge is imputed to the bank. Simmons Creek Coal Co. v. Doran, 142 U.S. 417 at page 436, 12 S.Ct. 239, 35 L.Ed. 1063. It was not an innocent holder of such bonds in due course without notice, but acquired the possession thereof subject to all defenses.

We agree with the finding of the district court that, "Estelle R. Firebaugh, Russell Firebaugh, as trustee and as president of The Bond & Mortgage Company, The Bond & Mortgage Company and Cloverdale State Bank were so interlocking of their control of The Bond & Mortgage Company and of the issuance, transfer and exchange of said bonds that they all had notices of the defenses to said bonds."

The claim of the bank was properly denied, and the judgment of the district court is affirmed.